## Commonwealth v. Ward

*Harry Shapiro*, assistant district attorney, for Commonwealth.
*Henry M. Stevenson*, for defendant.

GORDON, JR., J., February 6, 1933.—The prisoner at the bar, Arthur Ward, having pleaded guilty to an indictment for murder, the case is before the court en banc for the purpose of fixing the degree of the crime and determining the penalty to be imposed. The controlling facts of the case are as follows: The murder was committed on the highway at about 6 o'clock in the afternoon of August 1, 1932, in the neighborhood of Norris and Warnock Streets, in the City of Philadelphia. During the morning of that day, and up until 11 o'clock, Ward, the prisoner, had drunk about three pints of home-made wine, which, according to some of the witnesses, had been "laced," that is to say, had been mixed with a quantity of hard liquor. However, from the evidence presented, we are satisfied that, when the murder was committed, the prisoner was not under the influence of liquor, but was in full possession of his faculties. This is mentioned at this time because of a suggestion, thrown out at the hearing, that Ward may have been under the influence of liquor when the crime was committed, and in order definitely to indicate our belief and finding upon this subject. Shortly before the killing, the prisoner went to the home of his sister-in-law, where, after remaining for a time, he secured two revolvers, one of which he loaded, and then left the house. There is no evidence of what he intended doing with the revolvers, except his own statement that his purpose was to pawn them. Whether this was his real purpose in procuring them, we do not know, but we give him the benefit of belief in this particular, since there is nothing to indicate that he had them in his possession for a criminal purpose. However, this possession of firearms without a license was a serious criminal offense, for which he was liable to arrest on sight and to serve punishment. After leaving the house the prisoner entered the vestibule of a vacant house at No. 2037 Warnock Street through an opening in its storm-door, which was in a dilapidated

condition. Isadore Reinheimer, the deceased, a police officer on duty in uniform, noticed the prisoner in the vestibule and crawled through the hole in the door, placed the prisoner under arrest, searched him, found concealed inside his trousers the unloaded revolver and took possession of it. Reinheimer failed, however, to discover the loaded revolver, which Ward says he was holding concealed by his cap in his left hand. The officer then handcuffed his prisoner with an "iron claw," a form of single handcuff, and led him out of the building and down the street toward a firehouse, intending to send him from there to the police station. After they had proceeded down the street about a block, Ward suddenly began firing at the officer with the revolver he had retained, and endeavored to wrench himself free. In the scuffle Reinheimer drew his own pistol and fell to the ground. This released the prisoner, who thereupon disarmed the officer, and, with the latter's own weapon, fired additional shots at him. The prisoner then fled, and was captured about a half-hour later on the roof of a nearby house. There is evidence that during the course of the capture the prisoner fired a shot or shots at officers who were endeavoring to take him into custody. This evidence is contradicted, and it is difficult to reach a definite conclusion as to the fact. From the view we take of the case, however, we do not think that this shooting, if it actually did occur, is of any importance. It occurred after the killing, and at best merely confirms the already clear indications of the prisoner's frame of mind at the time. Officer Reinheimer had been shot four times—once in each arm, once in the leg and once in the middle of the back—the shot in the back being the fatal wound.

The evidence discloses that the prisoner's past life has been free from acts or circumstances indicating a vicious or depraved character. While he has been involved in trouble with the police on one or two occasions, it was for minor offenses, and he has never been charged with crime of a serious nature. Those who know him bear witness to his being a man of average intelligence, of an amiable disposition, not inclined to violence or brutality, that his habits with respect to the use of intoxicating liquor are neither better nor worse than those of the average user, and that when under its influence he is not quarrelsome.

From the foregoing facts it is clear that this homicide was murder of the first degree. It was a killing in an attempt to escape from custody after a lawful arrest. The concealing of the loaded weapon at the time of the arrest, and the period of time (about five minutes), short though it was, that elapsed between the arrest and the beginning of the shooting, compel the conclusion that the killing was characterized by sufficient deliberation and premeditation to make it murder of the first degree, which we accordingly find it to be.

We now come to the question of the penalty to be imposed. In considering this question, it should be noted that the law gives us no help by way of rules in determining whether the penalty should be fixed at death or life imprisonment. Indeed, from the very nature of the problem, which lies almost exclusively in the domain of social morality and factual justice, no rule could be laid down which would produce satisfactory results. The legislature, recognizing this and also that, from their circumstances, many murders of the first degree do not merit the death penalty, has wisely left to the conscience of the tribunal appointed to make the decision an unhampered freedom of choice between life imprisonment and death. Once guilt is established, the penalty which society is justified in demanding in individual cases involves fundamental considerations of social ethics as applied to each case, that cannot be classified by legal rules. The very necessity which brought about the law which puts upon the jury or the court, as the case may be, the duty of determining the penalty to be

exacted by society for the particular crime, illustrates the extra-legal considerations which enter into the determination of the proper penalty to be imposed. When all first-degree murder was punishable by death, juries were observed to be constantly rendering verdicts of lower degree in cases where the higher was clearly indicated by the evidence, because of the essential injustice of exacting the ultimate penalty of death under the facts of such cases. The hard, unbending rule of death for all first-degree murder was so generally recognized as inequitable in so many instances that, in order to bring about ultimate justice by securing a more accurate and true determination of legal guilt, the choice between life and death was committed to the unhampered discretion of the jury. A first-degree murder which, when committed under a given set of circumstances, might require the imposition of the death penalty, might well call for the imposition of only life imprisonment when committed under only slightly different circumstances. Thus, a murder committed in the perpetration of a robbery by a band of professional robbers with long records and notorious for brutality, and without any underlying motive except a greed for gain, would probably be held by all who believe the death penalty ever to be justified to call for its imposition; while a similar murder, committed under the powerful influence of primitive instincts, such as the spur of poverty and hunger, either personal or of loved ones and dependents, would probably be thought by most persons of conscience and humanity to call for no higher penalty than that of life imprisonment. Hence, even those types of murder which may be said generally to demand the extreme penalty cannot be made the subject of an inflexible rule. Homicides the result of passion may generally deserve only the penalty of life imprisonment; yet in such cases, if the period of premeditation is sufficient to comprehend systematic plotting and scheming to accomplish the purpose, the imposition of the death penalty might well be justified. It would be impossible, therefore, so to classify homicides by the establishment of invariable rules respecting the penalty to be imposed as to do substantial justice in particular instances. The exceptions within each class would be so numerous as to destroy any rule that might be attempted.

It may be said, but only as a general proposition, that the law intends that those murders which are accompanied by facts and circumstances indicating wanton disregard of life, cold and calculating cruelty, or a depraved and vicious character, are more deserving of the death penalty than the suddenly conceived, impulsive murder to which the perpetrator is driven by overpowering psychic impulses. And even within this general rule the exceptions are so numerous and so obvious that it can serve only as a most vague guide to the solution of this gravest of all judicial problems. The formulation of a rule being impossible, the problem can be solved only by the conscience of the individual or tribunal upon whom the duty of deciding is placed, and so it has been thought best that each of the judges who heard the present case should indicate his own reasons for reaching the final conclusion in which all concur. The writer will, therefore, briefly state his reasons for joining in fixing the penalty in this case at life imprisonment.

It is true that in Com. v. Garramone, 307 Pa. 507, the Supreme Court indicated the kind of murder which it deemed to merit the death penalty; and so, also, my brother Stern, in the case of Com. v. Ritter, 13 D. & C. 285, gave expression to similar lines of reasoning. I take it, however, that, in view of the careful avoidance by the legislature of prescribing any rules upon this subject, the expressions of both the Supreme Court and Judge Stern are to be read more as their personal judgments upon the subject, than as an attempt, by laying down a fixed rule, to intrude upon the free exercise of the conscientious judgment of

others upon whom this heavy duty may from time to time devolve. Indeed, I would incline to the view that it is dangerous to seek a formula for determining the question as to whether death shall be imposed rather than life imprisonment, for where no rule is possible, an attempt to formulate one inevitably leads to mischief and injustice.

The murder that was committed by this prisoner undoubtedly falls among the gravest kinds of homicide. It was a killing in an attempt to escape from custody, following a lawful arrest. The prisoner concealed his effective weapon when he was first placed under arrest. The time which elapsed between the arrest and the firing of the first shot—the time necessary for the officer to walk with his prisoner about a block—was ample in which deliberation and premeditation, as contemplated by law, could occur. In the strict and technical legal sense, therefore, this homicide was clearly a murder of the first degree in an effort to effect an escape; and, for exemplary reasons, as well as for the protection of officers in the enforcement of the law, such murders may be considered as generally deserving of the death penalty. Having said this, however, the worst that this case admits has been said against the prisoner. This is not a case of a plotted jailbreak, where guards are killed in the carrying out of a carefully laid scheme to escape; or even of a killing at the time of an arrest which the murderer, because of a criminal enterprise, had foreseen and long premeditated. There can be no doubt that Ward was not anticipating the arrest in this case. While the fact that he concealed one of his weapons would tend to indicate that the plan to kill was conceived at the time he was searched, it is an equally fair inference that the concealment was merely an effort to prevent the discovery of the full extent of the offense for which he was arrested. It is impossible that he premeditated and deliberated upon the murder before his discovery and arrest by the officer in the vestibule, for he could not have foreseen the circumstance: nor, even if he had, is there any evidence that he did. He, therefore, must have first entertained the purpose to kill at some point of time between his arrest and the firing of the first shot. He was actuated in the matter also by one of the most powerful and deeply-seated instincts of man—the desire for liberty and to escape punishment. His mental progress, therefore, from the first conceived purpose to kill to the carrying of it into effect, was so rapid as almost to negative deliberation, and can be readily and reasonably visualized. As he walked down the street, whatever may have been the point of time when he first entertained the thought of killing to escape, the swift approach of prison must have grown upon his imagination. Indeed, the sudden realization that he held in his hand the means of preventing the impending personal disaster, may well have furnished the suggestion of his criminal act but a few short moments before it was carried into effect. Admitting, however, that he consumed all of the time between the arrest and the firing of the shots in revolving and planning his act, that time was so short that, in my judgment, the killing was essentially an impulsive act induced by the strongest of human motives. This being so, it would seem to me that, notwithstanding that this was a homicide committed in an attempt to escape, its sudden and impulsive character robs it of all possible atrocious features and places it in that class of first-degree murders which do not deserve the exaction of the ultimate penalty. I believe that no murder in which the period of deliberation and premeditation is but a few minutes, and these packed with mental and emotional stress, ever deserves the death penalty, especially when it is committed by one whose past life has been peaceable and law-abiding, and this, although the murder is of that kind which generally, and for exemplary reasons, may be said to deserve the sterner character of punishment.

In reaching a decision on the question of penalty, one should not give way to a tendency to lose sight of the grave and terrible nature of life imprisonment. The choice to be made is not between freedom on the one hand and death on the other, but between death on the one hand and the uninterrupted, continuous laying on of the lash of punishment for the remaining span of a human life. Both penalties are awesome in their tragic consequences and in their implications. The lesser is, indeed, thought by many to be the greater of the two, and, except in the irrevocable finality of death, there is little to choose between them from the standpoint of their severity. The fact that executive clemency might be extended in the distant future to one imprisoned for life, and thus the payment by the felon of the full penalty of life imprisonment might be frustrated, cannot be considered in determining the penalty merited. If the offense merits only life imprisonment, neither the higher penalty which it does not merit should be inflicted, nor should the sovereign's prerogative of mercy be deliberately thwarted by the infliction of an undeserved and irremediable penalty. A decision based on such a motive is abhorrent to every principle of justice and righteousness.

One other factor, not without its importance, has influenced the decision in favor of life imprisonment rather than death in this case. The district attorney has stated on his official responsibility that the Commonwealth does not ask for the death penalty. While, of course, the responsibility for fixing the penalty cannot be shifted from the court to the prosecuting officer, his judgment should be given the utmost consideration, not only because of the value which a judgment based on wide experience in such matters must necessarily carry, but also because he expresses the wishes of the Commonwealth, the wronged party plaintiff, whose laws have been violated, whose citizen has been killed, and whose peace and dignity have been outraged by the crime. While such a recommendation cannot bind the court, I believe it is not only the right, but the duty, of the district attorney to state what the Commonwealth asks for in the way of penalty. He does so as a matter of course when the decision rests with a jury, and in this regard the court is merely performing, on a plea of guilty, the functions which primarily belong to a jury. Such a recommendation also emphasizes, and places in its proper light, the factor of reasonable doubt to which a prisoner is entitled on the question of penalty as much so as on a question of fact.

For these reasons I am of opinion that in this case the penalty should be fixed at life imprisonment, and in this conclusion my brethren concur.

LAMBERTON, J., concurring.—I join in adjudging the crime committed by the prisoner at the bar to be murder of the first degree, and in fixing the penalty at life imprisonment, for the reasons stated by Judge Gordon in the foregoing opinion. I also concur in the opinion of Judge Stern which follows. I do not see that the opinions of Judge Stern and Judge Gordon are in any way conflicting.

STERN, P. J., concurring.—While realizing the inherent difficulties involved in the fixing of a penalty as between life imprisonment and death, and that no hard and fast rules can be laid down as a definite standard, the writer attempted in Com. v. Ritter, 13 D. & C. 285, to formulate a set of principles which might be used roughly as governing the problem. Applying these principles, it would seem to me that the object of a sentence to deter others would necessitate in the present case the imposition of the death penalty. The forces of law and order must be proclaimed supreme, and a person under arrest must be made to understand that unlawful resistance to a police officer, causing his death, will be visited, generally speaking, by the infliction of the gravest penalty known to the law.

In the present proceeding, however, we are faced by the fact that the assistant district attorney who prosecuted the case not only insistently asserted that the Commonwealth did not ask for the death penalty, but that he thought that capital punishment should not be inflicted upon this defendant. While, of course, the ultimate responsibility lies with the court and the recommendation of the district attorney is merely advisory, a judge naturally would and should hesitate to impose a more severe penalty than that asked by the Commonwealth as represented by the public prosecutor. It is only for this reason that I concur with the other judges of the court in fixing the penalty at life imprisonment.